# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

SAGEMAYA DANDI,

    Plaintiff,

vs.                                                       Civil No. 98-1405 MV/WWD

KENNETH S. APFEL, Commissioner,
Social Security Administration

## MAGISTRATE JUDGE'S PROPOSED FINDINGS
## AND RECOMMENDED DISPOSITION
### Proposed Findings

    1. This matter comes before the Court upon Plaintiff's Motion to Reverse, filed June 29, 1999 **[docket # 6-1]**. The Commissioner denied Plaintiff's request for Supplemental Security Income ("SSI") benefits both initially and on reconsideration. After conducting an administrative hearing, the Commissioner's Administrative Law Judge ("ALJ") likewise denied the applications, concluding that Plaintiff has the residual functional capacity ("RFC") to return to his past relevant work as a cook, and that his paranoid personality disorder does not further reduce his RFC. The Appeals Council denied Mr. Dandi's request for review of the ALJ's decision, thus rendering the ALJ's decision the final decision of the Commissioner. Plaintiff now seeks review of that final decision pursuant to 42 U.S.C. §405(g). Plaintiff was fifty-one years old at the time of the hearing and alleges a mental disability.

    2. The standard of review in social security appeals is whether the Commissioner's final decision, in this case the ALJ's decision, is supported by substantial evidence. Thompson v. Sullivan, 987 F.2d 1482, 1487 (10th Cir. 1993) (citations omitted). Additionally, the

Commissioner's final decision can be reversed if the ALJ failed to apply the correct legal tests. Id. (citation omitted). Social Security Regulations require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. Id.; see 20 C.F.R. §§ 404.1520(a - f); 416.920. The sequential evaluation process ends if at any step the Commissioner finds that the claimant is disabled or not disabled. Id. (citations omitted).

3. At the first four levels of the evaluation, the claimant must show: (1) that he is not working; (2) that he has an impairment or combination of impairments severe enough to limit the ability to do basic work activities; (3) that the impairment meets or equals one of the listing of impairments in 20 C.F.R. Pt. 404, Subpt.P, App.1; or (4) that he is unable to perform work done in the past. At the fifth step, the Commissioner must produce evidence regarding the claimant's ability to perform other work. Reyes v. Bowen, 845 F.2d 242, 243 (10th Cir. 1988).

4. This case has a rather curious posture. The Commissioner agrees to a remand in order to request all current medical records and obtain both consultative medical opinions as well as vocational testimony. Plaintiff opposes a remand as "fruitless," believing that evidence from the medical reports contained in the record is clear enough to support a reversal.

5. Plaintiff is described by the ALJ as a "having no physical impairments and paranoid personality disorder." Tr. at 17. Based on a review of the record, this description is accurate. Mr. Dandi describes himself as a "political activist" interested in "justice for those people who walk and who choose to ride a bicycle." Tr. at 30, 66. He claims that his life "has been devastated as a result of the liberty that is granted by automotive transportation." Tr. at 38. He harbors a deep anger directed at governmental authority and at people in general who use automotive transportation as opposed to walking or riding bicycles. Tr. 63, 73. This anger no

2

doubt has been fueled by the alleged fact that he has been struck by automobiles while riding his bicycle six times in seven years.  Tr. at 35; 97.

      6.    Plaintiff chooses not to pay taxes and lives in a one-room cabin measuring under 400 square feet, without any electricity or running water.  He lives "from hand to mouth" and receives food stamps, Tr. at 31, and heats and cooks his food using propane and wood he cuts himself. Tr. at 33-34.  At the hearing, Mr. Dandi told the ALJ that although he does not own the cabin which is on public land, he considers himself to be the owner until someone forces him to leave. Tr. at 40-41.  His reluctance to own property is to have less which the government can take away. Tr. at 35.

      7.    According to Plaintiff, one of his past jobs was short-lived due to "confrontations with the management."  Tr. at 31.  Another job lasted only a few days due to the fact that Plaintiff threatened to "chop up" the chef with a french knife.  Tr. at 31, 70.  Plaintiff told the ALJ at the hearing that he has never been advised to take medication, but that he "would not accept" such advice or the authority of the person advocating that advice.  Tr. at 42.

      8.    Deciding whether remand or reversal is appropriate rests on whether the medical evidence leaves issues which require further development through the introduction of additional evidence or whether the existing record already clearly warrants an award of benefits.

      9.    Psychologist Elliot Rapoport treated Mr. Dandi for about 12 years.  Dr. Rapoport believes that there is some justification for Mr. Dandi's feelings of discrimination by society because he has insisted on riding a bicycle, and that even his choice to live as a pauper reflects Plaintiff's feelings of being removed from society.  Tr. at 89.  Because the drivers which struck him were never located, Plaintiff's injuries went uncompensated, and therefore these "physical

3

traumas" resulted in Mr. Dandi's loss of "essentially all of his personal property and the jobs which he had at that time." Tr. at 89.

10. The record contains notes in the form of letters written by Dr. Rapoport over a 12-year period at Plaintiff's request, apparently to expedite Plaintiff's application for food stamps or other similar purposes. Tr. at 86 88, 89, 91, 95. Dr. Rapoport opined that Plaintiff "should be considered totally and permanently disabled. . . [he] is unable to work in any situation which requires any level of supervision and, under any circumstances, he refuses to pay taxes and prefers instead to live as a pauper." Tr. at 86.

11. Plaintiff's primary difficulty is related to authority and authority figures. Tr. at 89, 91. Dr. Rapoport recommended that he should not be placed in employment situations where he'd be subject to authority or supervision, but that this problem "renders him effectively unemployable." Tr. at 91. In one letter addressed to the Department of Human Services in connection with Plaintiff's application for food stamps, Dr. Rapoport suggested that the agency not require him to fill out forms since even this would be seen as an "undue imposition of authority upon him." Id.

12. Other notes by Dr. Rapoport describe Plaintiff as not dangerous or psychotic, and "not prone to gross misperceptions of reality or psychotic behavior." He is seen as a "coherent spokesman on behalf of his concerns." Tr. at 88.

13. Dr. Michael Dudelczyk, M.D. evaluated Plaintiff one time in May 1996. Tr. at 83-84. He saw Plaintiff as a "contentiously, uncooperative man with a paranoid and complex delusional system related to governmental authority." Tr. at 83. Although he was unable to conduct a full interview due to Plaintiff's refusal to cooperate, Dr. Dudelczyk opined that Mr. Dandi's affect

was generally appropriate, intellect as high average, and that his "interpersonal skills are reasonable although there is a constant angry and paranoid twist to everything he talks about, especially concerning government." Tr. at 84. Dr. Dudelczyk could not be sure whether Plaintiff suffered from paranoid psychosis, but he opined that Plaintiff was "clearly not functional in the ordinary work world and has not been for many, many years." Id.

14. The record also contains a psychological evaluation by the Division of Vocational Rehabilitation in February 1984. The examiner found no "cognitive slippage or derailment," a high average to superior range of intelligence, and intact short and long-term memory. Tr. at 98. There was "good general rapport" throughout the interview, but also the "possibility of a deeply rooted characterological disturbance itself characterized by both paranoia and antisocial features." Id. Plaintiff was considered to have explosive emotional tendencies where he was "at least capable of aggression or physical violence." Tr. at 100. Because he would have difficulty maintaining supervised employment, some type of "direct sales" job was suggested. Tr. at 101.

15. The ALJ examined the medical reports, and found that Plaintiff did not have a listed mental impairment § 12.00(A). She found that although Mr. Dandi qualified under Part A of the listing, he did not qualify under Part B. Tr. at 19. She also completed the Psychiatric Review Technique ("PRT") Form herself, Tr. at 21-23, without a mental health advisor, which is allowed under the special procedures followed for mental impairments. See Andrade v. Sec'y of Health & Hum. Serv., 985 F.2d 1045, 1049 (10th Cir. 1993). Based on the evidence in the record, I find the ALJ's determination that Plaintiff did not qualify under a listed impairment to be supported by substantial evidence.

16. However, I do find there to be some question regarding the ALJ's findings on

subsequent steps which require a remand. The step three analysis has two problems. First, it is not clear whether Mr. Dandi's past work can be considered under the regulations as "past relevant work" since one job lasted for only 16 days and also Plaintiff may have worked at one or both jobs beyond 15 years. See 20 C.F.R. §404.1565.[1]

17. The other problem is that the ALJ's decision lacks the requisite consideration of the RFC specific to a step four analysis. In the first phase of the step four sequential analysis, the ALJ must evaluate a claimant's physical and mental (RFC); in the second, he must determine the physical and mental demands of the claimant's past relevant work; in the final phase, the ALJ determines whether the claimant has the ability to meet the job demands found in phase two despite the mental and/or physical limitations found in phase one. Winfrey v. Chater, 92 F.3d 1017, 1023 (10th Cir. 1996). Not only is the ALJ's decision here devoid of any such analysis, but no vocational testimony was obtained.

18. After having found Plaintiff not disabled at step four, the ALJ then inexplicably went on to a step five analysis, finding him not disabled under grid rule § 203.19. See Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (if determination can be made at any step, evaluation under subsequent steps is not necessary). I find that the ALJ erred at this stage by relying on the grids. Where a claimant's exertional capacity is restricted by nonexertional limitations (e.g., a mental impairment), reliance upon the grids is misplaced. See Ragland v. Shalala, 992 F.2d 1056, 1058 (10th Cir.1993).

19. Notwithstanding the finding that Mr. Dandi did not have a listed impairment, the evidence strongly indicates that he does have a significant nonexertional impairment. See

---

[1] The work history form is of no help here, since Plaintiff left that blank. Tr. at 82.

Thompson, 987 F.2d at 1488; SSR 85-16 (conclusions of ability to engage in substantial gainful activity are not to be inferred merely from the fact that the mental disorder is not of listing severity). At the very least, Plaintiff's feelings of being discriminated against by society and his considerable difficulty dealing with any kind of authority or supervision would, one would think, erode a good part of any vocational base and restrict the jobs which would be available to him. Here again, the testimony of a vocational expert ("VE") was indicated, but none was obtained.

20. Remand is in order. However, I find reversal to be premature. Given the type of errors made, it is appropriate that the case be revisited first by the Commissioner and not the Court. See Sisco v. U.S. Dept. of Health & Hum. Serv., 10 F.3d 739, 741 (10th Cir. 1993) (the Court may not reweigh the evidence or substitute its judgment for that of the Commissioner); see also Dugan v. Sullivan, 957 F.2d 1384, 1387 (7th Cir.1992) (when reviewing the ALJ's determination, court's function is not to reweigh the evidence or to decide whether the claimant is actually disabled).

21. The fact that Plaintiff has a paranoid personality does not in itself render him automatically disabled under the Social Security Act.[2] While the medical evidence underscores

---

[2] Whether a plaintiff with paranoid personality is disabled is extremely case-specific. As illustrations, in Moskowitz v. Shalala, 1995 WL 87316, *4 (E.D.N.Y.), plaintiff suffered from paranoid ideation and paranoid delusional systems. He was well oriented to time, place and person, was a very religious Jewish male and paranoid about the Nazis. His enemies were the United States government because of its anti-semitism, the P.L.O., the Nazis, and the Ku Klux Klan. His grandiose ideas about himself included wanting to track down Nazis in this country and his thinking contained aggressive content and paranoid trends. He had a marginal adaptation to reality "which he maintained by avoiding stresses." Nevertheless, the court affirmed the ALJ's determination that he was not disabled, largely based on the testimony of the vocational expert at the hearing. In a similar vein, the court in Moore v. Sullivan, 731 F.Supp. 1009, *1010 (D.Kan. 1989), affirmed the Appeals Council decision that plaintiff was not entitled to a period of disability or disability benefits under Title II, where plaintiff had paranoid personality, but no major psychiatric or physical illnesses which were detected.

7

the presence of a mental condition that bears scrutiny in that it appears to pose some limitations for employment, and therefore some restrictions on Plaintiff's mental RFC, physicians do not make determinations whether claimants are disabled under the Act.

22. Rather, the Commissioner is responsible for examining medical source opinions and making the determination on whether claimant meets statutory definition of disability. 20 C.F.R. § 404.1527(e)(1) (statement by a medical source that claimant is "disabled" or "unable to work" does not mean that the Commissioner will determine claimant is disabled); see also Kouril v. Bowen, 912 F.2d 971 (8th Cir. 1990) (acknowledging that although treating physician may be correct that it was "practically impossible" for claimant to function in the working world (and thus statutorily disabled), he could be mistaken, and that by regulation the Commissioner is guaranteed the opportunity to demonstrate that this possibility is a reality).

23. I agree with Plaintiff that supplementing the record with additional medical consultations would probably not be helpful, given the long-standing relationship Plaintiff has had with his treating psychologist and his reluctance to cooperate thus far with any consulting physician or agency. However, vocational testimony should be included on remand, in light of my findings regarding both step four and step five. The VE *may* come to same conclusion as doctors, and the Commissioner may also come to the same conclusion as the doctors, but that conclusion should be reached by the Commissioner and only after a proper evaluation is conducted.

### Recommendation

I recommend that Plaintiff's Motion to Reverse **[docket # 6-1]** is hereby DENIED and instead that the case be REMANDED to the Commissioner so that he can obtain vocational testimony in connection with a step four and step five analysis. Additional medical consultation

may be obtained, but is not required. Timely objections to the foregoing may be made pursuant to 28 U.S.C. § 636(b)(1)(C).

_____
UNITED STATES MAGISTRATE JUDGE

.